IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT R. BORYS,<br><br>                     Petitioner,<br><br>vs.<br><br>RAYTHEL FISHER, Warden, Valley State Prison,[1]<br><br>                     Respondent. | No. 2:15-cv-01942-JKS<br><br>MEMORANDUM DECISION |

Robert R. Borys, a state prisoner proceeding *pro se*, filed a Petition for a Writ of Habeas Corpus with this Court pursuant to 28 U.S.C. § 2254.  Borys is in the custody of the California Department of Corrections and Rehabilitation and incarcerated at Valley State Prison. Respondent has answered, and Borys has replied.

## I. BACKGROUND/PRIOR PROCEEDINGS

On December 30, 2008, Borys was charged with 27 sexual abuse counts in an information alleging that Borys continually molested his girlfriend's daughter when she was between the ages of 9 and 15.  The information further set forth as a special allegation that Borys had substantial sexual conduct with the named victim, who was then under the age of 14.  Borys pleaded not guilty to the charges and denied the special allegation.  He proceeded to a jury trial on July 27, 2010.  On direct appeal of his conviction, the California Court of Appeal recounted the following facts underlying the charges against Borys and the evidence presented at trial:

---

[1]      Raythel Fisher, Warden, Valley State Prison, is substituted for Daniel Paramo, former Warden, Richard J. Donovan Correctional Facility.  FED. R. CIV. P. 25(c).

### Doe's Testimony

Jane Doe was born in January 1993.  She was 17 at the time of the trial.  [Borys] had known Doe's mother P.H. for many years and began dating her when Doe was eight.  P.H. and Doe moved into a duplex on Canal Street in Placerville when Doe was nine.  The duplex was small, with only one bedroom and one bathroom.  Doe and P.H. slept in the bedroom's two beds.

According to Doe, [Borys] visited them almost every day when they lived on Canal Street.  On occasion, he would spend the night and shared a bed with P.H.  [Borys] had family dinners with Doe and P.H. and would talk about school with Doe.  Doe saw [Borys] as "kind of like how I would like picture a dad being."

The first molestation took place when Doe was nine-years-old.  [Borys] committed the act one day around 4:00 p.m. while Doe was at home after school and her mother was at work.  Doe was watching television with [Borys] when he asked her to sit on his lap.  She complied, and [Borys] started touching her on the crotch area outside her clothes.  He then moved his hands under her clothes, touching her vagina and putting his finger in her vagina.  She started to get up, but [Borys] said, "No.  No.  It's okay.  Just sit down."  After a minute or two, [Borys] pulled his hands out of her pants, smiled at her like he was very happy, and told her to get up.  [Borys] later told Doe what he did was okay because he loved her like a father loves his daughter.

A few days later, [Borys] touched Doe's vagina and her chest, both over and under her clothing.  Thereafter, [Borys] touched Doe's chest and vagina once or twice a week while they lived on Canal Street.  This would occur when her mother was out of the house running errands or when [Borys] was saying good night to Doe.

[Borys] told Doe not to tell her mother.  Doe was afraid to tell her mother because one time when she got up from [Borys's] lap, he grabbed her arm and it was not gentle.  Also, she had seen [Borys] yell at her mother; he seemed to anger easily and Doe was afraid of being yelled at like [Borys] yelled at her mother.

In the middle of sixth grade, Doe and her mother moved to a condominium at Cimarron Court in Cameron Park.  Doe had her own bedroom in the new residence.  [Borys] visited the residence every day and would spend the night with P.H. once or twice a week.

After Doe moved to Cameron Park, [Borys] started putting his mouth on her breasts and touching them.  One night, having gone to her room to tell Doe goodnight, [Borys] pulled down his pants and told Doe to touch his penis.  She refused, and [Borys] grabbed her hand and put the crying Doe's hand on his penis, moved her hand around it and told Doe, "It's okay.  It's not hurting you."  Thereafter, [Borys] told Doe "thank you" and left.  P.H. was downstairs watching television at the time.

Such incidents took place any night [Borys] was at the home or any time he was there and P.H. was not home.  During spring break for Doe's sixth and seventh grades, [Borys] took time off work to watch Doe.  During the two weeks she was on break, [Borys] molested her twice a day.

When Doe tried to resist, [Borys] would get forceful, holding her shoulders and telling her it was okay.  [Borys] would ask Doe if she wanted to ruin her mother's

happiness.  He "made it out to be if [Doe] said anything, [her mother's] whole world would just fall apart."

In April 2007, Doe, her mother, and [Borys] moved to a house on Hillcrest Street in Placerville.  Doe had a bedroom in the front of the new house while [Borys] and her mother shared a bedroom in the back of the house.

[Borys] had sexual intercourse with Doe in her bedroom one day in the summer of 2007.  Doe was 14–years–old at the time.  Doe cried during the assault.  During the assault, [Borys] told Doe "that's good" and "I like that."  But mostly, he just talked to Doe about her day "like nothing was going on at all."  The intercourse lasted about five minutes.  After this, the touching was replaced by acts of sexual intercourse, which varied in frequency from once or twice a week to almost every day up until [Borys's] arrest in 2008.

[Borys] gave nicknames to their genitalia, calling his penis "Joey" and Doe's vagina "Priscilla."  He would say things like, "It's time for Joey."

[Borys] bargained for sex with Doe, offering to buy her something after having sex with her or saying that she owed him when he bought something for her.  [Borys] kept pieces of paper on which maintained a record of sex he said Doe "owed" him for things he bought her, such as clothes.  [Borys] called them "bargains or deals," and he would say things to Doe like, "Now you owe Joey like one or two."

Doe testified that [Borys] also approved her clothing, preferring her to wear tight skirts and low-cut tops.  Starting in the eighth grade, [Borys] bought her underwear at Victoria's Secret with his credit card.

[Borys] orally copulated Doe on several occasions.  The first incident lasted about 10 minutes.  It happened about three or four times while they lived on Hillcrest Street.  He also sodomized Doe one morning while she was in bed.  That assault lasted "three or four minutes" and "hurt a lot," causing Doe to cry.  She was in tenth grade at the time.

In June 2008, [Borys] discovered Doe was messaging a boy on MySpace.  [Borys] accused Doe of having sex with the boy. The argument escalated until Doe pushed [Borys] away and he hit her.  When Doe screamed that [Borys] had hit her, P.H. came into the room, told Doe to get her things, and then took Doe to a friend's home.

[Borys], Doe, and her mother got together the next evening to talk about what happened.  After [Borys] accused Doe of being promiscuous, Doe asked to talk to her mother alone, and the two went into the bedroom.  Doe told her about the molestations.  According to Doe, her mother then asked [Borys], "Is this true? Have you really been doing this?  Is she right?  Have you been touching her?"  [Borys] responded, "Well, I'm not going to bullshit you.  It happened."

**Testimony of Doe's Mother**

P.H. testified that she met [Borys] when she was 17.  They dated for a few years before breaking up.  They reunited nine to ten years later, after P.H.'s husband died.  They resumed dating when Doe was about eight years old and P.H. and Doe were living near Clear Lake.  [Borys] was married at the time.

P.H. and Doe moved to the Canal Street residence in Placerville in 2000.  [Borys] visited frequently and sometimes spent the night with P.H.  P.H. loved [Borys] and

3

thought he was a good father to Doe.  Doe and P.H. moved to the Cimarron Court residence in the winter of 2002.  [Borys] visited P.H. regularly even though he was still married and living with his wife.

In April 2005, P.H. picked out a house with [Borys].  Shortly thereafter, [Borys] moved in with P.H. and Doe.  [Borys] participated in all family matters, including disciplining Doe.  [Borys] was "adamant" that Doe not date until she was 16.  P.H. agreed, but Doe thought they were wrong, because others at her school were dating.

[Borys] became "really frantic" about the boys Doe saw.  According to P.H., [Borys] thought Doe was having sex with the boys she dated "all the time."  [Borys] monitored Doe's behavior, particularly around boys.  He put a tape recorder in Doe's bedroom and installed a monitoring program on the family computer.  On one occasion, using his car, [Borys] followed Doe and a male friend.  When he returned, [Borys] said he saw Doe and the male close to one another.  He was upset about that.

On June 5, 2008, P.H. heard Doe arguing with [Borys].  She heard Doe say, "You hit me," and saw [Borys] backing Doe into a corner while they were very close to one another.  P.H. intervened and took Doe to her girlfriend's house, where Doe spent the night.  When P.H. returned from dropping off Doe, she suggested family counseling to [Borys].  [Borys] was adamantly against counseling.  He said it would not help the family.

Doe returned the next day.  That evening, P.H. again suggested they get family counseling.  [Borys] looked at Doe and said, "if we have counseling, there's going to be a lot of things coming up out in the open."  Doe then told P.H. that she needed to talk to her alone.  P.H. eventually agreed and accompanied Doe to her bedroom, where Doe told P.H. that [Borys] had molested her.

P.H. ran out of the bedroom and said to [Borys], "You son of a bitch.  You've been lying to me all this time."  According to P.H., [Borys] replied, "I'm not going to bullshit you.  It happened."  [Borys] was shaken.  He told P.H. he did not want to go to jail.  [Borys] kept saying "Look at all the things I did for you.  I put the roof on the house. I did all this stuff for you."  As P.H. and Doe were leaving, [Borys] told P.H. he did not want her to call the police.  P.H. and Doe went to P.H.'s mother's house, where P.H. called the police.

A letter from [Borys] was on the table when Doe and P.H. returned from the hospital and police station.  The letter said: "[P.H.], I know you are shocked about the revelation with [Doe] and don't want to talk to me, but I really do love you both.  Maybe too much.  You may not want to believe that, and that's okay.  I don't think I really have that much time left to live."  Continuing, [Borys] wrote that all he possessed went to P.H. and Doe but "That doesn't make up for what I did."  [Borys] also stated, "I really have felt sad this few years that you decided to have a child by another man and not me. Maybe that's what as driving me."

4

**The Sex for Favors Records**

Officers searched the Hillcrest residence and found notes in [Borys's] armoire referring to "Joey" and "Priscilla."  The notes contained entries such as "new verbal commitment to touch [Doe's first initial] 4x per mo.  Start Nov," and "Joey and Priscilla 4 times.  Did not demand from [Doe's first initial].  Used one.  Save three for future." Another read, "Negotiated 3 contacts for abnormal clothes purchases.  1 Joey contact left."  The writings extended back as far as 2005.

After his arrest, a police investigator asked [Borys] if he knew who Joey and Priscilla were.  [Borys] said Joey might be someone from his taekwondo class and he did not know who Priscilla was.

In a monitored conversation [Borys] had with his son at the jail, [Borys] said Joey and Priscilla were fictional characters.  But he also told his son not to tell the police about them.

**The Defense**

The defense was based on an extensive cross-examination of Doe in which defense counsel sought to undermine her credibility and portray her accusations as a product of an escalating conflict with [Borys] over his efforts to restrain her personal life.

Doe testified on cross-examination that a month before the trial she made a 911 call claiming that her boyfriend assaulted her.  She admitted lying about the assault when the police responded to the call.  Doe had been upset with her boyfriend because he stayed out with his friends.  She told the officers that she lied about the assault "just to get mean," that "it was really stupid of her," and that she felt "like an idiot now that everybody is here."  She also admitted to calling the prosecutor in [Borys's] case in an effort to get her boyfriend out of jail.

Doe lied to a detective when she said that she had not disclosed the molestations to anyone else; she had told an unnamed person online.  Also, Doe admitted she was not truthful when she wrote a letter stating that her mother saw [Borys] rubbing himself against her and had told Doe not to do it again.

When she was 13, Doe created various Internet profiles listing her age as 18, 21, and 27.  She contacted a man named Jeff online and claimed to be a model.  Her mother was very upset when she found out that Doe wanted to meet this man, who she had emailed and instant messaged.

Doe also admitted to sending naked photographs of herself to two boys, Seth and Cody.  In May 2008, when she was 15, Doe asked to spend the night at Cody's house in Elk Grove, but her mother said no.  That same month, Doe told a nurse she was never sexually active.

According to P.H., Doe was an excellent student from the third to ninth grades, but changed in high school.  One of her concerns was Doe's interest in boys.  P.H. also had concerns about Jeff, the man Doe contacted on-line, as early as 2006.  In April 2006, Jeff had offered to buy Doe a bus ticket so that she could meet him.  [Borys] reported the matter to the FBI.  Also, Doe told P.H. in 2006 that a visit to Seth's house would be supervised by a parent, but it was not.

5

> Doe and P.H. had recurring fights about Doe wearing suggestive clothing. According to P.H., Doe insisted on wearing high-end clothing, and no one told her what to wear.

*People v. Borys*, Nos. C066530, 2014 WL 5144576, at *1-5 (Cal. Ct. App. Oct. 14, 2014).

At the conclusion of the defense's case, the prosecution moved to dismiss one count, which was granted. Following deliberations, the jury found Borys guilty on all remaining 26 counts. The trial court subsequently denied Borys's application for probation and sentenced him to an aggregate term of 65 years' imprisonment. The court also ordered Borys to pay a $10,000 restitution fine.

Through counsel, Borys appealed his conviction, arguing that: 1) Borys's rights to a fair trial and to present a complete defense was violated when the court excluded evidence of Doe's prior sexual conduct; and 2) the trial court prejudicially erred when it failed to conduct an adequate investigation into possible juror bias and misconduct. The Court of Appeal unanimously affirmed the judgment against Borys in a reasoned, unpublished opinion issued on October 14, 2014. *Borys*, 2014 WL 5144576, at *12. Borys petitioned for review of both claims in the California Supreme Court, which was summarily denied on December 17, 2014.

Borys then filed a *pro se* petition for habeas relief in the California Supreme Court. In that petition, Borys claims that: 1) his trial counsel rendered ineffective assistance; 2) the prosecutor withheld exculpatory evidence; 3) the prosecutor presented false evidence to the jury; 4) the trial court and the prosecutor breached a plea agreement when it withdrew its plea offer; 5) his sentence of 65 years' imprisonment constitutes cruel and unusual punishment; and 6) he is actually innocent of the charges. The Supreme Court denied the petition without comment on February 17, 2016.

6

While his state habeas petition was pending, Borys timely filed a *pro se* Petition for a Writ of Habeas Corpus in this Court on September 9, 2015.  Docket No. 1; *see* 28 U.S.C. § 2244(d)(1),(2).  He moved to stay these proceedings pending completion of his state court habeas proceeding, which was granted.  Docket Nos. 7, 10.  After the Supreme Court summarily denied the state habeas petition, Borys filed a First Amended Petition ("Petition"), Docket No. 11, and the stay was lifted, Docket No. 15.  Briefing on this case is now complete, and the Petition is before the undersigned judge for adjudication.

## II. GROUNDS/CLAIMS

In his *pro se* Petition before this Court, Borys argues that: 1) the trial court erred in excluding evidence of the victim's prior sexual conduct; 2) the trial court erred when it failed to conduct an adequate investigation into possible juror bias and misconduct; 3) trial counsel rendered ineffective assistance; 4) the prosecution withheld exculpatory evidence; 5) the prosecutor presented false evidence at trial; 6) the trial court and the prosecutor breached a withdrawn plea agreement; 7) his sentence of 65 years' imprisonment constitutes cruel and unusual punishment; and 8) he is actually innocent of the charges.[2]

## III.  STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable

---

[2]    For the sake of clarity, the Court has renumbered the claims raised in Borys's supplement to the First Amended Petition, Docket No. 11 at 17-18, to proceed sequentially from Borys's initial claims.

7

determination of the facts in light of the evidence presented in the State court proceeding,"
§ 2254(d)(2).  A state-court decision is contrary to federal law if the state court applies a rule that
contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that
are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives
at a different result.  *Williams v. Taylor*, 529 U.S. 362, 406 (2000).  The term unreasonable is a
common term in the legal world.  The Supreme Court has cautioned, however, that the range of
reasonable judgments may depend in part on the nature of the relevant rule argued to be clearly
established federal law.  *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004) ("[E]valuating
whether a rule application was unreasonable requires considering the rule's specificity.  The
more general the rule, the more leeway courts have in reaching outcomes in case-by-case
determinations.").

The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1)
"refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the
relevant state-court decision."  *Id.* at 412.  The holding must also be intended to be binding upon
the states; that is, the decision must be based upon constitutional grounds, not on the supervisory
power of the Supreme Court over federal courts.  *Early v. Packer*, 537 U.S. 3, 10 (2002).  Where
holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it
cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'"
*Carey v. Musladin*, 549 U.S. 70, 77 (2006) (citation omitted).

To the extent that the Petition raises issues of the proper application of state law, they are
beyond the purview of this Court in a federal habeas proceeding.  *See Swarthout v. Cooke*, 131 S.
Ct. 859, 863 (2011) (per curiam) (holding that it is of no federal concern whether state law was

correctly applied).  It is a fundamental precept of dual federalism that the states possess primary authority for defining and enforcing the criminal law.  *See, e.g.*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *Walton v. Arizona,* 497 U.S. 639, 653 (1990) (presuming that the state court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002).

In applying these standards on habeas review, this Court reviews the "last reasoned decision" by the state court.  *See Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004) (citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)).  A summary denial is an adjudication on the merits and entitled to deference.  *Harrington v. Richter*, 562 U.S. 86, 99 (2011).  Under the AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

## IV. DISCUSSION

**Ground 1.** *Evidentiary Error*

Borys first argues that the trial court erred in excluding evidence of the victim's prior sexual conduct.  According to Borys, that exclusion prevented him from presenting a complete defense and undermined his due process rights.  In considering this claim on direct appeal, the Court of Appeal laid out the following factual background:

> The prosecutor moved in limine to exclude evidence of Doe's prior and subsequent sexual conduct, citing Evidence Code sections 7822 and 1103, subdivision (c)(1).[FN3]  Defense counsel, who had not filed an Evidence Code section 782 motion, replied: "I think this is going to get flushed out after [Doe] testifies.  Because at that point, I'm going to know where she's coming from.  And I may or may not have something I think is relevant . . . ."  The trial court ruled, "Well, basically what I'm

saying is, [the prosecutor's motion] is granted subject to your making a determination after the witness's—any of the witness's testimony that any of this information is relevant, and then we'll discuss it."

> FN3.    Evidence Code section 1103, subdivision (c)(1) provided: "Notwithstanding any other provision of this code to the contrary, and except as provided in this subdivision, in any prosecution under Section 261, 262, or 264.1 of the Penal Code, or under Section 286, 288a, or 289 of the Penal Code, or for assault with intent to commit, attempt to commit, or conspiracy to commit a crime defined in any of those sections, ... opinion evidence, reputation evidence, and evidence of specific instances of the complaining witness' sexual conduct, or any of that evidence, is not admissible by the defendant in order to prove consent by the complaining witness."

Prior to the resumption of voir dire the following day, the prosecutor raised another in limine matter.  He moved to preclude evidence of the age of the victim's then current boyfriend, who was 24–years–old.  The prosecutor argued that two years had passed since the victim's disclosure, the victim was nearly 18 and the person she was seeing at that point was not in her life when there was concern about her dating at the time of her disclosure, and thus his age was not relevant.  [Borys] asserted the boyfriend's age related to the tension at home caused by the victim's behavior and her motive for accusing [Borys] of molestation.  Counsel asserted, that the victim "has a history of seeking out older men.  That's the sort of boundary that the parents keep trying to keep under control."  Again, the prosecutor asserted Evidence Code sections 782 and 1103, subdivision (c)(1).  The trial court ruled that the probative value of evidence of the boyfriend's age was outweighed by its prejudicial effect and precluded the evidence.  Thereafter, defense counsel asserted he had information that indicated the victim had been "actively chasing older men."  The trial court maintained its ruling, but indicated a willingness to revisit the issue depending on how Doe testified.

Defense counsel began his opening statement later that day.  In it, counsel outlined the defense theory of the case—that Doe fabricated the charges of molestation because she wanted to conduct her personal life free from restrictions.  Counsel began to outline what he expected the evidence would show—Doe's contact with Jeff, the family's attempt to monitor her computer activities, and Doe's conflicts over Doe's desire to have a boyfriend.  Counsel then brought up a statement on Doe's MySpace page, which contained the words, "I like it, the way your dick tastes" and "I'm your 'ho' " and "You're my pimp."  The trial court called a sidebar and admonished counsel that he was commenting on matters which were within the scope of the court's in limine ruling.

Counsel resumed his opening argument, mentioning Doe's fight with [Borys], her mother's intervention, and Doe leaving for her friend's house.  Counsel then addressed the family meeting the next day, at which the MySpace page was discussed and [Borys] accused Doe of engaging in sexual behavior, including oral copulation.  The prosecutor objected, and at the ensuing sidebar, the trial court admonished counsel that "this is

10

exactly the type of information I have ruled is not to be discussed." The trial court sent the jury home. Thereafter, the prosecutor told the court he intended to draft a special instruction to address defense counsel's discussion of Doe's alleged sexual conduct. The trial court indicated it would hold an Evidence Code section 402 hearing regarding evidence of Doe's sexual conduct the following morning.

The following morning, the trial court noted that defense counsel had not filed an affidavit or made the appropriate motion after the prosecution filed its motion to preclude evidence of Doe's sexual conduct under Evidence Code sections 782 and 1103, subdivision (c)(1). The court further noted that based on the defense failure to file a motion to admit evidence of Doe's sexual conduct, "I indicated that I would wait until after the . . . alleged victim, complaining witness, testified because you said you would know after that occurred whether or not you would have any evidence or any statements that you wanted to use to attack her credibility that were related to these areas that the Court had excluded in light of the [prosecution's] in limine motion." The trial court further noted that defense counsel had violated the court's in limine ruling twice during opening statements. The trial court reiterated to defense counsel that he could not address prospective evidence in his opening statement that had not been approved for admission by the court, and ruled that counsel was "not allowed to talk about anything regarding the sexual allegations relating to [Doe] without first having a 402 hearing outside the presence of the jury and doing a 352 analysis."

To address the impact of defense counsel's conduct, the prosecutor requested that the court read to the jury a special instruction he had drafted, and the court agreed to do so over defense counsel's objection. Defense counsel asked if he could file an Evidence Code section 782 declaration and the court indicated he could.

When the jury returned, the trial court told the jury, "some issues came up yesterday that I want to address right now and I want to read you an instruction. [¶] The instruction is this: That in this case, no evidence may be presented regarding the complaining witness's sexual conduct with individuals other than the Defendant. This includes opinion evidence, reputation evidence, and evidence of specific instances. This type of evidence is not relevant to these proceedings and should not be considered by you in any way." The court then reiterated its earlier instruction that nothing the attorneys say is evidence.

Thereafter, defense counsel filed an Evidence Code section 782 motion seeking an Evidence Code section 402 hearing. In the motion, [Borys] asserted, "The motive explanation for the defense case will work only if the defense gets to set up the motive in a way that explains the defendant's actions in grounding, curtailing, monitoring [Jane Doe's] behavior as actions that any responsible parent would do in light of what he or she is dealing with." Paragraphs 4 though 13 of the motion set forth the evidence [Borys] sought to admit. The court allowed some evidence and precluded other proffered evidence.

### 1. Evidence Allowed by the Trial Court

Paragraph 8 stated, "The defendant discovers that Jane Doe has sent full naked pictures of herself to her boyfriend. Defendant requests permission to provide fully

redacted photos hiding all improper nudity." The trial court precluded the photographs but ruled that trial counsel could present oral evidence of them.

The trial court also allowed the evidence sought in paragraphs 12 and 13, Doe's statement to a medical professional, one week after [Borys's] arrest, that she just had sex for the first time, and her statement on May 21, 2008, that she was not sexually active.

As to paragraph 10, which addressed the fight between [Borys] and Doe, the trial court withheld ruling on this until [Borys's] cross-examination of Doe.

**2. Evidence Precluded by the Trial Court**

The trial court excluded the following evidence set forth in paragraphs 4 through 7 and 9:

### Paragraph 4

"The complaining witness had an internet relationship with a 20 plus year old man. This relationship was going on until Mother discovered it. Once discovered, a family discussion occurred which required that [Doe] discontinue contact with the man. There is proof of instant messaging between the parties regarding the breakup."

### Paragraph 5

"The content involved during the internet relationship involved the man asking her to make a video of herself. The defendant, in turn, contacts the FBI in order to report the adult male. The defense has the FBI report."

### Paragraph 6

"The complaining witness, then 13 after confronted [sic] by the defendant and her mother that she engaged in oral copulation of her then boyfriend Seth confirms that something sexual occurred. This incident resulted in a 'No SETH' rule imposed by the defendant and [Doe's] mother."

### Paragraph 7

"[Doe's] mother and the defendant confronted [Doe] about her MySpace postings 'I'm your hoe, your my pimp.' In an interview with the police [P.H.] confirms that a family meeting occurred discussing this topic."

### Paragraph 9

"All these incidents led to a blow out fight where the defendant confronts [Doe] and accuses her of having sex with boys to which she responds 'I wish,['] while claiming to the police she was being sarcastic."

### 3. The Trial Court's Ruling

The court ruled that the items in paragraphs 4 through 8 were inadmissible, because although they had some relevance on credibility, "that impact is outweighed by the prejudicial effect and by the legislative intent of [Evidence Code section] 782." The trial court ruled the item in paragraph 9 inadmissible because it did not attack Doe's credibility.

*Borys*, 2014 WL 5144576, at *5-7.

The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." U.S. CONST. amend. VI. It is well settled that, under the Sixth Amendment, an accused has the right to present witnesses, testimony and other evidence in his defense. *See Washington v. Texas*, 388 U.S. 14, 19 (1967). However, "[t]he accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." *Taylor v. Illinois*, 484 U.S. 400, 409-10 (1988). States have considerable latitude under the Constitution to establish rules excluding evidence from criminal trials. *Holmes v. S. Carolina*, 547 U.S. 319, 324 (2006). "Thus, a trial judge may exclude or limit evidence to prevent excessive consumption of time, undue prejudice, confusion of the issues, or misleading the jury. The trial judge enjoys broad latitude in this regard, so long as the rulings are not arbitrary or disproportionate." *Menendez v. Terhune*, 422 F.3d 1012, 1033 (9th Cir. 2005) (citations omitted); *see Montana v. Egelhoff*, 518 U.S. 37, 42-43 (1996) (holding due process rights are not violated by exclusion of relevant evidence where probative value is outweighed by danger of prejudice or confusion).

13

California Evidence Code § 1103 governs the admissibility of a rape victim's prior sexual history.[3]  *People v. Chandler*, 65 Cal. Rptr. 2d 687 (Cal. Ct. App. 1997).  The California Legislature amended § 1103 to prevent a rape victim from being questioned extensively about any prior sexual history without a showing such questioning was relevant, reasoning that fear of personal questions would deter victims from filing complaints, thus resulting in a lower rate of reported rapes.  *People v. Casas*, 226 Cal.Rptr. 285 (Cal. Ct. App. 1986).  As a result, § 1103(c) provides that a rape defendant cannot introduce opinion evidence, reputation evidence, and evidence of specific instances of the alleged victim's previous sexual conduct with persons other than the defendant to prove the victim consented to the sexual acts alleged.  CAL. EVID. CODE § 1103(c).  But because a victim's credibility is virtually always an issue in sexual assault cases, § 782 provides a procedure requiring an *in camera* review of the proffered evidence to diminish the potential abuse of § 1103(c)(4).  *See* CAL. EVID. CODE § 782.  Thus, the defense may offer evidence to attack the victim's credibility through prior sexual conduct if, after a hearing, the trial court concludes that the proffered evidence's prejudicial effect is substantially outweighed by its probative value under§ 352.  *Chandler*, 65 Cal. Rptr. 2d at 690.

---

[3]    Section 1103(a)(1) provides that "evidence of the character or a trait of character (in the form of an opinion, evidence of reputation, or evidence of specific instances of conduct) of the victim . . . is not made inadmissible by Section 1101 if the evidence is . . . [o]ffered by the defendant to prove conduct of the victim in conformity with the character or trait of character." CAL. EVID. CODE § 1103(a)(1).

The foregoing subsection is limited by § 1103(c)(1), which provides in relevant part that in rape cases, "opinion evidence, reputation evidence, and evidence of specific instances of the complaining witness' sexual conduct, or any of that evidence, is not admissible by the defendant in order to prove consent by the complaining witness." *Id.* § 1103(c)(1).

Federal Rule of Evidence 403, the federal counterpart to California Evidence Code section 352, permits the exclusion of evidence if its probative value is "substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  "A district court is afforded wide discretion in determining the admissibility of evidence under the Federal Rules.  Assessing the probative value of [the proffered evidence], and weighing any factors counseling against admissibility is a matter first for the district court's sound judgment under Rules 401 and 403 . . . ."  *United States v. Abel,* 469 U.S. 45, 54 (1984); *see Boyd v. City and Cnty. of San Francisco*, 576 F.3d 938, 948 (9th Cir. 2009).  California employs a similar rule.  *See People v. Harris*, 118 P.3d 545, 565 (Cal. 2005) ("We review for abuse of discretion a trial court's rulings on the admissibility of evidence.").

In *Wood v. Alaska*, 957 F.2d 1544, 1549-50 (9th Cir. 1992), the Ninth Circuit laid out a two-part inquiry to determine whether a petitioner's Sixth Amendment rights are violated by restricted cross-examination.  The first inquiry is whether the evidence is relevant.  *See id*. at 1550.  If the evidence is relevant, the next inquiry is whether other legitimate interests outweigh the defendant's interest in presenting the evidence.  *See id*.  In *Wood*, the Ninth Circuit explained that there will not be a Sixth Amendment violation "so long as the jury has 'sufficient information' upon which to assess the credibility of a witness."  *Id*. (citation omitted).

Under these guidelines, this Court cannot find that the trial court's restriction on the proposed cross-examination was either unreasonable or contrary to federal law.  *See Perry v. Rushen*, 713 F.2d 1447, 1453 (9th Cir. 1983) ("Evidence of little importance, whether merely cumulative or of little probative value, will almost never outweigh the state interest in efficient

15

judicial process.").  As the appellate court concluded, "[t]he [trial] court correctly applied the rules of evidence and the application fo the ordinary rules of evidence does not generally infringe impermissibly on a defendant's constitutional rights.  This case does not present an exception to this rule."  *Borys*, 2014 WL 5144576, at *8 (citation omitted).

Borys argues, as he did on direct appeal, that the evidence was admissible because it was offered to attack the victim's credibility.  But as the Court of Appeal explained:

> [S]ome of the evidence that the trial court initially precluded regarding Doe's Internet relationship with a man named Jeff actually came in during the trial.  The jury heard that Doe had communicated with Jeff by email and instant message, she posed as a model, Jeff offered to buy her a bus ticket, and [Borys] reported the communications to the FBI.  The defense was also allowed to get Doe to admit placing on her MySpace page the phrase, "She likes the way ya dick tastes."
>
> To the extent the proffered evidence the jury did not hear was relevant to Doe's credibility, it was largely cumulative of other evidence.  Moreover, the evidence presented a danger of prejudice and confusing the issues by focusing the jury's attention on the more lurid details of Doe's life rather than on her credibility.  It was not an abuse of discretion to keep the case on the relevant issues—Doe's accusations and her credibility—and avoid the nonprobative, prejudicial, and potentially confusing issue of Doe's sexuality.

*Borys*, 2014 WL 5114576, at *8.

This conclusion is both reasonable and fully supported by the record, and fully comports with federal law, as discussed above.

Moreover, the Court cannot find unreasonable or contrary to federal law the appellate court's alternative holding that, even if the trial court erred in precluding the evidence, Borys

was not prejudiced by the error because any such error was harmless.[4]   As the Court of Appeal

reasonably concluded:

> Even assuming the trial court erred in precluding any of the evidence [Borys] contends should have been admitted, [Borys] has suffered no prejudice.  [Borys] was afforded the opportunity to present his defense.  As recounted above, the direct and cross-examination of Doe and her mother presented ample evidence of Doe's conflict with [Borys] and her mother over desire to have relationships with members of the opposite sex.  The defense established that Doe had a sexualized message on her MySpace page.  She admitted fighting with her mother over wearing suggestive clothing, and to picking out thong underwear with her friend.  Doe admitted that she posed as an older woman online, had an online relationship with a man which led to [Borys] reporting the matter to the FBI, and sent naked pictures of herself to some boys she knew.  Doe and her mother also testified to the conflict over Doe's desire to date before [Borys] and her mother would allow it.  This included Doe lying about whether a night spent at a boy's house was chaperoned, and Doe's efforts to spend the night at the house of a boy in Elk Grove.  Contrary to [Borys's] assertion that the trial court "precluded the primary theory of the defense," we conclude that not to be the case.
>
> Moreover, [Borys] admitted sexual conduct with Doe when he said, "I'm not going to bullshit you.  It happened."  His statement before Doe's disclosure that "if we have counseling, there's going to be a lot of things coming up out in the open" was also incriminating.  His letter in which he stated, "I know you are shocked about the revelation with [Doe]" without any denial that the revelation was true and his acknowledgment, "That doesn't make up for what I did" were also incriminating.  And the Joey and Priscilla writings—his record keeping of sex acts he felt he was owed—was extremely damming evidence.  We have no trouble concluding beyond a reasonable doubt that the additional attacks on Doe's credibility would not have changed the result.
>
> In asserting that the asserted error was not harmless, [Borys] further contends that the benefit derived from the evidence that was admitted was "undone by the special jury instruction requested by the prosecution and given to the jury," which according to [Borys] told the jury to completely disregard any of Doe's sexual conduct with others.  [Borys] ignores that the instruction was given as a remedy for counsel's discussion of

---

[4]        Other courts have admonished that harmless error review should not be confused with the sufficiency of the evidence inquiry required under *Jackson v. Virginia*, 443 U.S. 307, 324 (1979).  *See, e.g.*, *Jensen v. Clements*, 800 F.3d 892, 902 (7th Cir. Sept. 8, 2015) ("Time and time again, the Supreme Court has emphasized that a harmless-error inquiry is not the same as a review for whether there was sufficient evidence at trial to support a verdict.").  The Court's reliance on the proffered evidence in finding that any error was harmless does not simply focus on the sufficiency of the other evidence, but rather properly "look[s] at the influence the improperly admitted [evidence] had on the verdict," in light of a "host of factors," including the overall strength of the prosecution's case.  *Id.* at 904 (citations omitted).

Doe's sexual conduct in his opening statement in violation of the court's in limine ruling, before he sought permission to introduce the evidence as required by Evidence Code section 782. Although [Borys] does not mention it, we observe that the trial court did not expressly withdraw or modify the instruction at the end of the trial. And we note that the prosecutor began his closing argument, "I want to start, before I even get into my argument, with what is not allowed in this case, what is not acceptable, and what is not permissible. [¶] The judge gave you this instruction at the outset of this case. It read as follows: 'In this case no evidence may be presented regarding the complaining witness's sexual conduct with individuals other than the Defendant. This includes opinion evidence, this includes reputation evidence, and this includes evidence of specific instances. This type of evidence is not relevant to these proceedings and should not be considered by you in any way.'" He then urged the jury not to "buy-in to the Defense attempts to slander" Doe because such slander is not allowed by the law. "You don't get to say, '"Oh, she's just a big slut, so you shouldn't believe her."' That's why these laws are in place."

Assuming the court erred in not withdrawing or modifying its earlier instruction and assuming the prosecutor's argument was error and [Borys] did not forfeit any claim related to that argument by failing to object to the argument in the trial court, we conclude that any such errors are harmless. The evidence that [Borys] continually molested Doe, including his admissions and incriminating writings, was overwhelming.

*Borys*, 2014 WL 5144576, at *9.

In sum, Borys fails to show that the evidence in question was wrongfully excluded, or that his constitutional rights were violated as a result. Borys is therefore not entitled to relief on this ground.

**Ground 2.**     ***Juror Bias/Misconduct***

Borys next contends that the trial court erred by failing to conduct an adequate inquiry into potential juror misconduct. The Court of Appeal considered and rejected this claim on direct appeal as follows:

During voir dire by the prosecutor, the following took place:

"[PROSECUTOR]: . . . Anything we need to talk to you about at this point? [¶]

"[JUROR NO. 8]: My wife had to testify in an indecent exposure case, and she had to go to jury for that. Not jury, she was a witness.

18

"[PROSECUTOR]: She was a witness in a jury trial?

"[JUROR NO. 8]: Correct.  [¶] . . . [¶]

"[PROSECUTOR]: Anything about that that's going to make this hard for you?

"[JUROR NO. 8]: I don't believe so.

"[PROSECUTOR]: You feel pretty confident about your ability to do this?

"[JUROR NO. 8]: Yes."

Defense counsel voir dired Juror No. 8 about the rule that one witness could be enough for a conviction.  He asked, "do you understand that there might be other information in the case that might contradict that witness?"  Juror No. 8 responded, "Yes, I understand."  After a series of hypotheticals involving the prospect of evidence in addition to that of the single witness, defense counsel asked, "you might want to know about some of those other facts," to which Juror No. 8 responded, "Right."

Later, defense counsel asked another juror "Do you feel like a teenager might lie about sexual abuse."  After that juror responded, defense counsel questioned Juror No. 8 about the same subject:

"[DEFENSE COUNSEL]: [Juror No. 8], what are your feelings on that?

"[JUROR NO. 8]: I guess it's possible that they could lie about it.

"[DEFENSE COUNSEL]: What if they are angry? [¶] . . . [¶]

"[JUROR NO. 8]: Then it's certainly possible."

Later, after asking other jurors about the "one witness rule," defense counsel returned to Juror No. 8:

"[DEFENSE COUNSEL]: [Juror No. 8], you're going to hear testimony from witnesses if you're selected.  And would you be able to take into account all the evidence you get in the case before deciding whether or not someone is being accurate or someone is not being accurate?

"[JUROR NO. 8]: Yes, I would feel I have to."

Later counsel for [Borys] requested and was permitted to reopen his voir dire to ask Juror No. 8 about the case involving his wife.

"[DEFENSE COUNSEL]: You said that your wife was a witness in some case?

19

"[JUROR NO. 8]: Yeah.

"[DEFENSE COUNSEL]: Okay.  Did you have any part in that case at all?

"[JUROR NO. 8]: No.

"[DEFENSE COUNSEL]: Okay.  Can you tell me about when that case was.

"[JUROR NO. 8]: What year?

"[DEFENSE COUNSEL]: Yeah.  I mean, is it recent, long time ago?

"[JUROR NO. 8]: No, it was like probably 1979, 1980.

"[DEFENSE COUNSEL]: Anything that sticks with you in your mind that might somehow not allow you to be a juror in this case?

"[JUROR NO. 8]: About that or about anything in general?

"[DEFENSE COUNSEL]: No, about that.

"[JUROR NO. 8]: No.

"[DEFENSE COUNSEL]: How about anything in general, since you brought it up?

"[JUROR NO. 8]: Just that I think over the course of it, it's going to be a lot of anxiety, a lot of stress.  Yeah, I think I can get through it, but it's going to be—I don't think it was brought up very—by either side telling the people do we really understand how much anxiety, how much stress it's going to put on us.

"[DEFENSE COUNSEL]: Tell me more about that.

"[JUROR NO. 8]: I just think it would be pretty stressful.  I don't handle it well, but I think I can get through it.  That's me, I guess. [¶ . . . [¶]

"[DEFENSE COUNSEL]: Well, thank you for sharing that with us [Juror No. 8]. [¶]  That might qualify you to be a great juror, to understand that this is the real thing."

At a break after defense counsel concluded his opening statement, Juror No. 8 asked to speak to the court and counsel.  Juror No. 8 told the trial court: "The only thing I was thinking about was the trial that my wife was on years ago and I was—I mean, I was

in the audience and I heard the testimony of the defense.  It just kind of sticks in my mind. I still don't think it will have any impact, it's just the way the story went that I felt it was just a made-up story."

> "THE COURT: Okay.  But you understand that was a separate trial, a whole different case and these are different facts, different attorneys, different individuals?
>
> "[JUROR NO. 8]: Yeah.
>
> "THE COURT: And the question is are you going to be able to concentrate on this case, the evidence that is presented in this case and abide by the instructions on the law that I give in this case and apply those instructions, *being fair and impartial to both sides?*  (Italics added.)
>
> "[JUROR NO. 8]: Yes, I believe so."

After the prosecutor indicated he had no questions, the court permitted defense counsel to voir dire.

> "[DEFENSE COUNSEL]: What kind of case was that?
>
> "[JUROR NO. 8]: It was an indecent exposure.  A man exposed himself to my wife.
>
> "[DEFENSE COUNSEL]: *Okay.  I have no further questions.*" (Italics added.)

On the next day of trial, defense counsel asked to reopen examination of Juror No. 8 to make sure that he could be fair and impartial since the juror's answers indicated that his wife was the victim in the prior case.  The trial court denied the request.  The court stated that he understood the juror to have indicated the prior experience would not affect his ability to be fair.

> Ignoring all of the relevant voir dire of Juror No. 8, including the trial court's question to the juror about his ability to be fair when the juror later voluntarily came forward, [Borys] contends that the juror may have been biased, because he had said his wife was a witness in an indecent exposure case during voir dire, but later explained she was a victim in the case.  [Borys] argues the trial court did not fulfill its duty to investigate the possibility of juror bias.  He concludes the court's error violated his jury trial and fair trial rights.
> "The decision whether to investigate the possibility of juror bias, incompetence, or misconduct rests within the sound discretion of the trial court.  A hearing is *required* only where '"the court possesses information which, if proven to be true, would constitute 'good cause' to doubt a juror's ability to perform his duties and would justify

his removal from the case."'"  A trial court has broad discretion to decide whether and how to investigate possible juror bias or misconduct.

Here, the trial court inquired into Juror No. 8's possible bias.  The juror had brought the matter to the court's attention and said he understood that the instant case was separate from the prior case involving his wife.  While [Borys] ignores the trial court's question and the juror's response about his ability to be fair, we do not.  And we note that the trial court was in a position to observe the juror's demeanor when he said he thought he could be fair and impartial.

The revelation that in the prior case, the juror's wife had been the victim of indecent exposure, not just a witness—a revelation which came to light during questioning by defense counsel without follow-up by counsel—did not provide, as a matter of law, good cause sufficient to require additional inquiry by the court.  It was not an abuse of discretion to deny [Borys's] request to reopen questioning of Juror No. 8.

*Borys*, 2014 WL 5144576, at *10-12 (citations omitted).

The Sixth Amendment guarantees criminal defendants the right to a "fair trial by a panel of impartial, 'indifferent' jurors."  *Irvin v. Dowd*, 366 U.S. 717, 722 (1961); *see Dyer v. Calderon*, 151 F.3d 970, 973 (9th Cir. 1998).  While "[d]oubts regarding bias must be resolved against the juror," *United States v. Martinez-Martinez*, 369 F.3d 1076, 1082 (9th Cir. 2004), a defendant "bears the burden of showing that a juror was actually biased against him or her and that the district court abused its discretion or committed manifest error when it failed to excuse the juror for cause," *United States v. Hanley*, 190 F.3d 1017, 1030 (9th Cir. 1999) (internal quotation marks and alteration omitted), *superceded by statute on other grounds as stated in United States v. Jose*, 780 F. App'x 464, 466 (9th Cir. 2019).  "If only one juror is unduly biased or prejudiced or improperly influenced, the criminal defendant is denied his Sixth Amendment right to an impartial panel."  *United States v. Hendrix*, 549 F.2d 1225, 1227 (9th Cir. 1977).

Here, however, Borys fails to demonstrate the existence of juror bias.[5]  A trial judge's

finding that a juror was not biased is a factual finding presumed to be correct because "resolution

[of the juror impartiality issue] depends heavily on the trial court's appraisal of witness

credibility and demeanor."  *Thompson v. Keohane*, 516 U.S. 99, 111 (1995); *see, e.g.*,

*Wainwright v. Witt*, 469 U.S. 412, 428-29 (1985); *Patton v. Yount*, 467 U.S. 1025, 1038 (1984).

This presumption of correctness also applies to implicit factual findings.  *Tinsley v. Borg*, 895

F.2d 520, 525 (9th Cir. 1990).  Here, Borys's bare assertion that the juror was biased does not

meet his burden of adducing clear and convincing evidence sufficient to overcome the

presumption of correctness afforded the trial court's implicit finding of impartiality.  *See* 28

U.S.C. § 2254(e)(1).   It was also reasonable for the appellate court to conclude, as a matter of

law, that the fact that the juror's wife had been the victim of indecent exposure did not provide

good cause sufficient to require additional inquiry by the court.  Accordingly, the state court's

rejection of Borys's juror bias claim did not contravene or unreasonably apply federal law, and

Borys cannot prevail on this claim.

**Ground 3.**   *Ineffective Assistance of Counsel*

Borys additionally avers that trial counsel rendered ineffective assistance in a variety of

way.  Specifically, Borys faults counsel for failing to: 1) introduce Doe's statements to her

medical examiners about her sexual activity; 2) introduce Doe's sexual abuse exam and call an

expert to testify that the exam showed no indication of sexual battery; and 3) object when the

---

[5]        Indeed, Borys's juror bias claim is seemingly foreclosed by the defense's failure
to question the juror, during the initial inquiry, about the fact that his wife had been the victim
rather than an unaffected witness in the prior case.  It does not appear that Borys has claimed in
either this Court or the state court that trial counsel was ineffective in this regard.

prosecutor asserted in closing argument that Borys picked up Doe from school between the fourth and ninth grades.  Borys raised these claims in a habeas petition filed in the California Supreme Court, which the Supreme Court summarily denied.

To demonstrate ineffective assistance of counsel under *Strickland v. Washington*, a defendant must show both that counsel's performance was deficient and that the deficient performance prejudiced his defense.  466 U.S. 668, 687 (1984).  A deficient performance is one in which "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment."  *Id.*

The Supreme Court has explained that, if there is a reasonable probability that the outcome might have been different as a result of a legal error, the defendant has established prejudice and is entitled to relief.  *Lafler v. Cooper*, 132 S. Ct. 1376, 1385-86 (2012); *Glover v. United States*, 531 U.S. 198, 203-04 (2001); *Williams*, 529 U.S. at 393-95.  Where a habeas petition governed by AEDPA alleges ineffective assistance of counsel, the *Strickland* prejudice standard is applied and federal courts do not engage in a separate analysis applying the *Brecht* harmlessness standard.  *Avila v. Galaza*, 297 F.3d 911, 918, n.7 (9th Cir. 2002); *see also Musalin v. Lamarque*, 555 F.3d 830, 834 (9th Cir. 2009).  Under this rubric, in reviewing ineffective assistance of counsel claims in a federal habeas proceeding:

> The question "is not whether a federal court believes the state court's determination" under the *Strickland* standard "was incorrect but whether that determination was unreasonable—a substantially higher threshold."  And, because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard.

*Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (citations omitted); *see also Runningeagle v. Ryan*, 686 F.3d 758, 775 (9th Cir. 2012).

Thus, Borys must show that his trial counsel's representation was not within the range of competence demanded of attorneys in criminal cases, and there is a reasonable probability that, but for counsel's ineffectiveness, the result would have been different. *See Hill v. Lockhart,* 474 U.S. 52, 57 (1985). An ineffective assistance of counsel claim should be denied if the petitioner fails to make a sufficient showing under either of the *Strickland* prongs. *See Strickland*, 466 U.S. at 697 (courts may consider either prong of the test first and need not address both prongs if the defendant fails on one).

Borys fails to satisfy this heavy burden with respect to any of his claims. With regard to his contention that trial counsel should have successfully introduced Doe's statements to medical personnel, the record reflects that the trial court did in fact admit, as a prior inconsistent statement, one of the two statements at issue. As to the other statement, Borys does not state what argument counsel should have made that would have caused the trial court to determine, after it questioned Doe about the circumstances surrounding that statement, that the statement was admissible as a prior consistent statement. Such omission is fatal to his claim. *See Jones v. Gomez*, 66 F.3d 199, 205 (9th Cir. 1995) ("[C]onclusory suggestions that . . . state appellate counsel provided ineffective assistance fall far short of stating a valid claim of constitutional violation.").

Nor can he show that counsel was ineffective for failing to move to admit the report of Doe's sexual assault examination, or that he was prejudiced as a result. As an initial matter, Borys did not provide this Court or the state court a copy of the exam that reflects that Jane Doe had no indication of sexual battery**.** This lack of evidentiary support is fatal to his claim. *Woodford v. Visciotti*, 537 U.S. 19, 15 (2002) (*per curiam*) (holding that state habeas petitioner

carries the burden of proof).  Moreover, even if the report reflected that fact, and the report provided no other reason to believe that counsel had a tactical reason for excluding it, Borys fails to show that a better result was likely had the report been introduced, particularly given that the record reflects that the jury was already aware that no physical evidence showed the abuse.

Finally, Borys claims that "trial counsel failed to object to the prosecutor's closing statements alleging Petitioner would pick up [Jane Doe] from school during the fourth through seventh grades, when there was no proof provided."  But it appears that Borys misconstrues the record; the prosecutor did not assert that Borys picked Jane Doe up from school from the fourth through ninth grades.  Rather, the record reflects that the defense introduced day care records from these years to show that Jane Doe's mother paid for Doe to be in extended day care on some days during that time and thus would not be alone with Borys at those times.  The prosecutor referred to the records and argued that they were irrelevant because they did not show what days she was paying for such care, and thus the records provided no basis to acquit Borys. Borys provides no valid objection that defense counsel could have made.  *See Rupe v. Wood*, 93 F.3d 1434, 1444-45 (9th Cir. 1996) (defense counsel's failure to raise a meritless argument or to take a futile action does not constitute ineffective assistance of counsel).  In sum, Borys is not entitled to relief on any argument advanced in support of his ineffective assistance claim.

**Ground 4.**     ***Brady Violation***

Borys also argues that the prosecutor suppressed exculpatory evidence regarding Jane Doe's sexual conduct, in violation of *Brady v. Maryland*, 373 U.S. 83 (1962).  *Brady* and its progeny require the prosecution to disclose material information that is "favorable to the accused, either because it is exculpatory, or because it is impeaching."  *Strickler v. Greene*, 527

U.S. 263, 281-82 (1999).  A *Brady* violation occurs only where there is a "reasonable probability" that a different verdict would have resulted from disclosure of the information that the defendant claims was suppressed.  *Id.* at 281.  That is, "a constitutional error occurs, and the conviction must be reversed, only if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial."  *United States v. Bagley*, 473 U.S. 667, 678 (1985).

Borys fails to establish a *Brady* violation here.  In support of his claim, Borys argues that the trial court improperly excluded evidence regarding Jane Doe's sexual conduct.  But the record reflects that the defense was in possession of that information, which counsel used in its response to the prosecution's motion *in limine*.  The record therefore supports that the evidence was disclosed and known to the evidence, and there is no basis to claim that it was withheld or suppressed.  To the extent Borys's claim could be construed to challenge the *trial court's* exclusion of that information, such claim is duplicative of Ground 1, and fails for the reasons discussed *supra*.  Accordingly, Borys is not entitled to relief on this ground.

**Ground 5.** *Prosecutorial Misconduct*

Borys similarly argues that the prosecutor committed misconduct by using "false documentation" to argue that Borys picked Jane Doe up from school.  According to Borys, he "never had authority to pick up Jane Doe from school, and the fact remains that [he] never did pick up Jane from school at any time" before April 2005—*i.e.*, when Jane Doe was in elementary school.

When a prosecutor obtains a conviction by the use of testimony or evidence that he knows or should know is false, the conviction must be set aside if there is any reasonable

likelihood that the testimony could have affected the judgment of the jury. *See United States v. Agurs*, 427 U.S. 97, 103 (1976); *Napue v. Illinois*, 360 U.S. 264, 269 (1959) (same result obtains when State, although not soliciting false evidence, allows it to go uncorrected when it appears). To prevail on a claim of prosecutorial misconduct for use of false witness testimony or evidence, a petitioner must show that (1) the testimony or evidence was actually false, (2) the prosecution knew or should have known that the testimony or evidence was false, and (3) the false testimony or evidence was material. *Henry v. Ryan*, 720 F.3d 1073, 1084 (9th Cir. 2013); *see also Hayes v. Brown*, 399 F.3d 972, 984 (9th Cir. 2005) (prosecutor's action in presenting false evidence to the jury and by failing to correct the record violated petitioner's rights).

To successfully raise a claim cognizable on habeas review based on a prosecutor's comments at trial, a petitioner must demonstrate that the prosecutor's comments "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). Under this standard, only egregious prosecutorial misconduct can give rise to a constitutional claim. *See Duckett v. Godinez*, 67 F.3d 734, 743 (9th Cir. 1995). A prosecutor's comments in summation constitute grounds for reversal only when the remarks caused actual prejudice. *Shaw v. Terhune*, 380 F.3d 473, 478 (9th Cir. 2004) (applying harmless error test to claim of prosecutorial misconduct in summation).

Here, however, Borys provides no reason to conclude that the prosecutor presented false evidence, and fails to show that the prosecutor's comments on the matter constituted misconduct. Borys bases his prosecutorial misconduct claim only on alleged inconsistencies in the testimony of Jane Doe and her mother, who both testified about who picked her up from school. The

record reflects that Jane Doe testified that she could not remember whether Borys picked up her from elementary school.  And while her mother initially testified that she was the only person who picked Doe up from school, after reviewing the extended care records, she later indicated that someone else occasionally would do so.  But mere inconsistencies in the evidence do not establish the knowing use of false testimony by the prosecutor.  *See United States v. Geston*, 299 F.3d 1130, 1135 (9th Cir. 2002) (rejecting contention that the testimony of two prosecution witnesses regarding officer's use of a wooden, rather than metal, baton was false, even though some physical evidence supported finding that a metal baton was used, because "at most, two conflicting versions of the incident were presented to the jury"); *United States v. Zuno-Arce*, 44 F.3d 1420, 1423 (9th Cir. 1995) (fact that witnesses told stories that conflicted in various respects did not establish that the prosecutor knew that the testimony of any of the witnesses was false; and observing that "[l]awyers in criminal cases, for prosecution and defense, sometimes swim in a sea of lies, and must necessarily trust the jury to determine what is true, or whether reasonable doubt remains about what is true").  The assertedly-conflicting evidence on which Borys's prosecutorial misconduct claim is predicated is insufficient to establish a *Napue* violation.  This is particularly true given that whether Borys picked Jane Doe up from elementary school was not material or central to his conviction.  Accordingly, Borys is not entitled to relief on this ground.

**Ground 6.**     ***Breach of Plea Agreement***

Borys next contends that the prosecution improperly withdrew a plea agreement, which he contends constitutes a breach of that agreement.  "[W]hen a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the

inducement or consideration, such promise must be fulfilled." *Santobello v. New York*, 404 U.S. 257, 263 (1971). Plea agreements are contracts, and the government is held to the literal terms of the agreement. *United States v. Johnson*, 187 F.3d 1129, 1134 (9th Cir. 1999). A prosecutor who breaches a promise that induced a guilty plea violates the defendant's due process rights. *Buckley v. Terhune*, 441 F.3d 688, 694 (9th Cir. 2006)(en banc)(relying on *Santobello*).

But the record here reflects that Borys and the prosecution entered into a *conditional* agreement. *See United States v. Trapp*, 257 F.3d 1053, 1056 (9th Cir. 2001) (finding no breach due to the conditional nature of the government's promise in a plea agreement), *cf. United States v. Hawley*, 93 F.3d 682, 693 (10th Cir. 1996) ("If at a later date the government discovers facts [undercutting the basis for the plea agreement], it has the ethical obligation to withdraw from the plea agreement and advise the defendant so that he or she may prepare for trial or renegotiate. It is certainly not proper for the government to wait until the sentencing hearing [and] then breach the terms of the plea agreement . . . ."). Under that conditional agreement, which was read into the record, Borys agreed to plead no contest to counts 15 (lewd act with a child) and 18 (anal and digital penetration with a foreign object) and be evaluated by a mental health professional. The agreement required Borys "to be completely honest with the doctor regarding all of the incidents that occurred with [Jane Doe]." If he did so, he would receive a 10-year prison sentence. The agreement further stipulated, however, that if "the People feel that [Borys] was not honest with the doctor then the deal is off the table and the People will proceed to jury trial."[6]

---

[6]    In the event the prosecution withdrew from the conditional agreement, the prosecution agreed not to use at trial any information Borys provided the examining doctor, unless for impeachment purposes.

After reviewing the doctor's report, the prosecution informed the court and defense counsel of its belief "that [Borys] did not honor the plea bargain by being completely forthcoming."  The prosecution stated that it was withdrawing the plea agreement, over defense objection.  The trial court overruled the objection and ordered that the agreement be withdrawn and all original charges reinstated.

Although Borys contends that the prosecution's withdrawal of the plea agreement constitutes a breach of the agreement, the California Supreme Court's summary rejection of this claim reflects its determination that no breach occurred on the Government's part.  This conclusion is both reasonable and fully supported by the record, which reflects that the prosecution, and the trial court, merely enforced the agreement's terms as agreed to by Borys on the record in open court.  Notably, neither *Santobello* or any other federal authority requires a prosecutor to maintain a conditional agreement where he or she determines, in accordance with the agreement, that a defendant has failed to fulfill it.  *See Ricketts v. Adamson*, 483 U.S. 1, 11-12 (holding that defendant's breach of plea agreement requirement to testify against associates rendered plea agreement void); *United States v. Aguilar-Muniz*, 156 F.3d 974 (9th Cir. 1998) ("After a plea agreement has been accepted and entered by the court, the court may not rescind the plea agreement on the government's motion unless the defendant has breached the agreement").  Borys is thus not entitled to relief on this ground.

**Ground 7.**     ***Cruel and Unusual Punishment***

Borys further avers that his determinate sentence of 65 years' imprisonment constitutes cruel and unusual punishment.  The Eighth Amendment, applicable to the States through the Fourteenth Amendment, proscribes the infliction of "cruel and unusual punishments."  U.S.

CONST. amend. VIII; *Kennedy v. Louisiana*, 554 U.S. 407, 419 (2008).  The Supreme Court has held that "the only relevant clearly established law amenable to the 'contrary to' or 'unreasonable application of' framework is the gross disproportionality principle, the precise contours of which are unclear, applicable only in the 'exceedingly rare' and 'extreme' case." *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (citation omitted).  In determining whether to infer gross disproportionality, a federal court should examine whether a petitioner's sentence is justified by the gravity of his triggering offense and his criminal history, a process similar to the three-pronged approach employed by California state courts.  *See Ramirez v. Castro*, 365 F.3d 755, 768 (9th Cir. 2004).

Here, the California Supreme Court, through summary denial on habeas review, upheld Borys's 65-year sentence where he was convicted of multiple counts of child molestation.  Given the length of Borys's term and in light of his age,[7]  the Court recognizes that it is the functional equivalent of a life without parole ("LWOP") sentence, and will consider it in accordance with case law evaluating LWOP sentences.  *See Moore v. Biter*, 715 F.3d 1184, 1191-92 (9th Cir. 2013).  Although the United States Supreme Court has condemned LWOP sentences for juvenile offenders, *see Graham v. Florida*, 560 U.S. 48, 75 (2010) (LWOP sentence is unconstitutional for juveniles who committed non-homicide offenses); *Miller v. Alabama*, 567 U.S. 460, 476 (2012) (mandatory LWOP sentence unconstitutional where sentencing court has no discretion to consider the defendant's youth or other "mitigating qualities"), Borys was well into adulthood when he committed these crimes and therefore does not benefit from this authority.  And

---

[7]     The State of California's inmate locator system reflects that Borys is currently 76 years of age.  *See* https://inmatelocator.cdcr.ca.gov/ (Inmate No. AE7439).

although it may raise a theoretical question as to whether a sentence that far exceeds a

defendant's life expectancy is appropriate or necessary, *see People v. Deloza*, 957 P.2d 945 (Cal.

1998) (Mosk, J., concurring) (decrying multi-century sentences as oblivious to life expectancy

tables), the U.S. Supreme Court has upheld the constitutionality of lengthy sentences imposed

pursuant to the Three Strikes law, *Lockyer*, 538 U.S. at 77 (50 years to life imprisonment for

petty theft), and has not clearly-established that LWOP sentences are unconstitutional for adult

offenders who commit violent crimes.

Nor can Borys demonstrate that his is one of the exceedingly rare cases in which the

sentence imposed raises an inference of gross disproportionality when compared to the crime

committed.  *See, e.g.*, *Ewing v. California*, 538 U.S. 11, 29-30 (2003) (sentence of 25 years to

life for grand theft of $1,200 of golf clubs was not cruel and unusual); *Lockyer*, 538 U.S. at 77.

The California Supreme Court's affirmance of Borys's sentence was therefore not "contrary to,

or . . . an unreasonable application of," the gross disproportionality principle, the contours of

which are unclear.  *Lockyer*, 538 U.S. at 72-73.  Although Borys stresses his "impeccable record

of maintaining continuous employment [ and lack of] arrest record," the fact remains that Borys

committed serious crimes.  As the Ninth Circuit Court of Appeals has observed:

> "[T]he impact of [child molestation] on the lives of [its] victims is extraordinarily
> severe."  *Cacoperdo v. Demosthenes*, 37 F.3d 504, 508 (9th Cir. 1994); *see Stogner v.*
> *California*, 539 U.S. 607, 651, 123 S.Ct. 2446, 156 L.Ed.2d 544 (2003) (Kennedy, J.,
> dissenting) ("When a child molester commits his offense, he is well aware the harm will
> plague the victim for a lifetime.").  Indeed, while "psychological or physical harm is
> necessary to constitute 'abuse[,]'" *United States v. Baza–Martinez*, 464 F.3d 1010, 1017
> (9th Cir. 2006), "[t]he use of young children [by adults] for the gratification of sexual
> desires constitutes an abuse. . . .  It constitutes maltreatment, no matter its form."  *United*
> *States v. Baron–Medina*, 187 F.3d 1144, 1147 (9th Cir. 1999); *see, e.g.*, *United States v.*
> *Valencia–Barragan*, 600 F.3d 1132, 1136 (9th Cir. 2010).  "[W]e and our sister circuits
> have [therefore] consistently held that sexual offenses [by older adults] against younger

children constitute 'crimes of violence.'"  *United States v. Medina–Villa*, 567 F.3d 507, 515 (9th Cir. 2009).
*Norris v. Morgan*, 622 F.3d 1276, 1294 (9th Cir. 2010) (upholding a LWOP sentence for a single conviction resulting from touching the victim's genitalia over her clothing for "a couple of seconds").  For these reasons, Borys is not entitled to relief on this ground.

**Ground 8.    *Actual Innocence***

Finally*,* Borys claims that he is actually innocent of the charges for which he was convicted.  Although the Ninth Circuit has not "resolved whether a freestanding actual innocence claim is cognizable in a federal habeas corpus proceeding in the non-capital context," it has "assumed that such a claim is viable."  *Jones v. Taylor*, 763 F.3d 1242, 1246 (9th Cir. 2014) (citations omitted).  This Court therefore assumes that a freestanding actual innocence claim is cognizable on federal habeas review.

Although the Ninth Circuit has not "articulated the precise" standard to establish a "freestanding actual innocence claim," *id.* at 1247, it has called the standard "extraordinarily high," *id.* at 1246 (citations and internal quotation marks omitted).  "[A]t a minimum, the petitioner must go beyond demonstrating doubt about his guilt, and must affirmatively prove that he is probably innocent."  *Id.* (citations and internal quotation marks omitted).  Indeed, both the Supreme Court and the Ninth Circuit have rejected freestanding actual innocence claims in the face of compelling new evidence where the new evidence did not "'conclusive[ly] exonerat[e]'" the petitioner or "'preclude any possibility of [the petitioner's] guilt.'"  *Id.* at 1247-48 (quoting *House v. Bell*, 547 U.S. 518, 555 (2006) and *Carriger v. Stewart*, 132 F.3d 463, 477 (9th Cir. 1997)).

In his Petition, Borys asserts that it "is an absolute certainty that he was factually innocent." Petition at 37. However, he cites no new facts or evidence in support of that claim. Rather, he merely contends that, "had it not been for an overly zealous prosecutor and an ineffective [] trial counsel, it is highly probable that a different result would have been in [his] favor." *Id*. But as discussed thoroughly above, Borys fails to demonstrate prosecutorial misconduct or ineffective assistance of counsel  Indeed, Borys's actual innocence argument appears to be based on the trial court record. Thus, Petitioner fails to meet the standard enumerated in *Schlup v. Delo*, 513 U.S. 298, 324 (1995), which requires "new reliable evidence . . . that was not presented at trial" as the basis for an actual innocence claim. Moreover, any evidentiary weaknesses and ineffective assistance argued by Borys at best demonstrate legal insufficiency, rather than factual innocence, which is wholly insufficient to show actual innocence. *See Bousley v. United States*, 523 U.S. 614, 623 (1998) ("'[A]ctual innocence' means factual innocence, not mere legal insufficiency."); *Calderon v. Thompson*, 523 U.S. 538, 559 (1998). The Supreme Court's rejection of Borys's actual innocence claim was therefore neither unreasonable nor contrary to federal law, and he is not entitled to relief on this ground.

## V. CONCLUSION AND ORDER

Borys is not entitled to relief on any ground raised in his Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of Appealability. *See* 28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree

with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El*, 537 U.S. at 327)).  Any further request for a Certificate of Appealability must be addressed to the Ninth Circuit Court of Appeals.  *See* FED. R. APP. P. 22(b); 9TH CIR. R. 22-1.

The Clerk of the Court is to enter judgment accordingly.

Dated: August 3, 2021.

____/s/James K. Singleton, Jr._____
JAMES K. SINGLETON, JR.
Senior United States District Judge
